UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

CHRIS GRUNDER,                    )
                                  )
            *Petitioner*,          )
                                  )
v.                                )        No.  4:09-cv-22
                                  )        *Mattice*
                                  )
JOSEPH EASTERLING, Warden,        )
                                  )
            *Respondent*.          )

## MEMORANDUM

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Chris Grunder ("Grunder").  The matter is before the court on the respondent's motion to dismiss.  Grunder has not filed a response to the motion to dismiss and the court deems Grunder to have waived his opposition to the dispositive motion.  *Elmore v. Evans*, 449 F. Supp. 2, 3 (E.D. Tenn. 1976), *aff'd mem.*, 577 F.2d 740 (6th Cir. 1978); E.D.TN. LR7.2. For the following reasons, the motion to dismiss [Court File No. 12] will be **GRANTED**, the petition for the writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.

## I.    Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases In The United States District Courts, the court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. If the record shows conclusively that Grunder is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

## II.    Factual Background

The respondent has provided the court with copies of the relevant documents as to Grunder's direct appeal and post-conviction proceedings. [Court File No. 14, Notice of Filing Documents, Addenda 1-18]. Grunder was convicted by a jury, in the Circuit Court of Bedford County, Tennessee, of especially aggravated kidnapping, aggravated rape, aggravated assault, and theft of property over $500.00; he was sentenced to an effective sentence of 31 years. On direct appeal, Grunder challenged the sufficiency of the evidence as well as his sentence. The Tennessee Court of Criminal Appeals found the evidence was sufficient to support the conviction and thus affirmed the conviction; the appellate court,

however, found that the trial court improperly enhanced Grunder's sentence in light of *Blakely v. Washington*, 542 U.S. 296 (2004), and thus reduced Grunder's effective sentence to 29 years. *State v. Grunder*, No. M2003-01823-CCA-R3-CD, 2005 WL 49747 (Tenn. Crim. App. Jan. 5, 2005), *perm. app. denied, id.* (Tenn. May 23, 2005) [Addendum 10].

In a lengthy summary, the Tennessee Court of Criminal Appeals stated the evidence against Grunder as follows:

> G.H., the victim, testified that on August 16, 2002, the Defendant and another man brutally beat and raped her and stole her car. She said that, on August 16, she was at home with her girlfriend, Cynthia Hamm. G.H. said that she and Hamm each consumed approximately eight to ten beers, and she was accustomed to this amount of alcohol consumption. G.H. said that she and Hamm began to argue, so she took her beer and left the house. G.H. stated that she drove her red Pontiac Sunbird on Jackson Street, towards Estill Springs to go walk through the flea market there to "calm down" before she returned home.

> G.H. testified that, as she drove down Jackson street, she noticed two white men walking on the side of the road. She noted that she thought she recognized the shorter of the men as her cousin. G.H. stated that the taller of the two men made a hand gesture, which she believed was a wave. She explained that she pulled over to the side of the road, and the two men approached the driver's side window. She stated that, as the men approached, she realized the shorter man was not, in fact, her cousin. She described the shorter man as "shorter and stockier than the other man." She stated that she "couldn't see much of his face because "[he had] bushy hair and [a] bush[y] mustache, and he had a scruffy face."

> G.H. testified that the taller of the two men was wearing blue jeans, a black shirt, and a vest. She said that the taller man had numerous tattoos covering his forearms. She described him as having long hair that he wore down and loose, and his hair was lighter in color than the shorter man's hair. G.H. testified that she later learned that the taller of the two men was the Defendant. She said she got a good look at the Defendant at that point and

later, as she drove the men around, noting that she even remembered that the Defendant's jeans were worn and frayed at the ends.

G.H. stated that, after the men approached her window, the Defendant told her that he had been walking all day, and he asked her if she would give the two men a ride to a friend's house. G.H. said she agreed to give the two men a ride, and they got into her car, the shorter man in the back seat and the Defendant in the front passenger side seat. She stated that, upon the Defendant's direction, she drove the men to an apartment complex. G.H. testified that, after the Defendant discovered his friend was not home, the Defendant requested that she drive the men to another friend's house. As she was driving, the Defendant asked her to stop at a convenience store, where he went into the store and, upon his return, offered her a beer, which she declined. G.H. said that, as she continued driving the two men to the next location, the Defendant instructed her to turn off Jackson Street just past a sign for "Normandy Dam," on Normandy road. She stated that, after turning onto this road, she began to get more uncomfortable and frightened, because the area was wooded and remote. G.H. said that she stopped the car and politely explained that she could take the men no farther, and she requested that the men get out of her car. At this point, G.H. said, the Defendant "snickered" and told her that she "was going to take them wherever [the Defendant] wanted, or [the Defendant] was going to make [her]."

G.H. explained that, suddenly, she was "grabbed from behind." She said that the man in the backseat grabbed her hair and pulled her head backwards. She said that she felt him press a knife against her, underneath her chest. G.H. stated that the Defendant got out of the car and both men dragged her over the center console into the passenger side seat. She said that the Defendant was grabbing and pulling her by the arm, and the other man was holding her hair and pressing the knife against her. She said that the Defendant went around the car and got into the driver's seat, while the man in the backseat held her by the hair and kept the knife against her. G.H. testified that the Defendant drove up the road and turned onto a gravel road, past a truck with a trailer attached, and drove under a train trestle. She said that the Defendant stopped the car and got out, and then he grabbed her by the shirt and the arm, and dragged her across the console out the driver's side door. She said she was kicking and screaming for help, even kicking her shoes off in the process. She testified that the Defendant told the shorter man to "knock out the light" in the car, which he did. G.H. explained that, after the Defendant dragged her from the car, he began beating her and hitting her with his fist.

G.H. testified that she lost consciousness during the beatings, and was unsure of when or how her clothes were removed. G.H. went on, explaining that the shorter man got out of the car, grabbed her by the arms, and pulled her face down across the hood of her car. She said that the Defendant held her head down against the car with one hand, holding her hair against the hood, as he wrapped the other arm around her waist, placing his hand on her stomach. At this point, G.H. testified, she was totally naked. She explained that the Defendant began raping her from behind, first vaginally, then anally. G.H. said that the Defendant next turned her over and held her by the hair and punched her in the face with his fist. G.H. recalled that the Defendant yelled at her that "[she] was fucking getting what [she] fucking deserved." She said that she lost consciousness, but when she awoke, the Defendant had her bent backwards over the hood of her car and was raping her again. G.H. said that she began kicking and screaming and fell to the ground.

G.H. testified that, after she fell down, the Defendant grabbed her by the ankle, dragged her across the gravel, and "slung" her into the car. She said that she remembered the Defendant being on top of her and slapping her in the face. She said that she lost consciousness again, and, when she awoke, the shorter man was on top of her, raping her from behind, as she lay face down on the seat of the car with her neck draped over the center console. G.H. testified that she began kicking and screaming again. She said that the men pulled her from the car and she "was just knocked out." G.H. said that, when she awoke, her car was gone. G.H. testified that she began crawling towards the paved road, but was in so much pain that she collapsed and lost consciousness again. She said that she awoke briefly and remembered bright lights and people in uniform talking to her and wrapping her in a plastic cover. G.H. stated that she did not remember anything else until she was in the hospital and a female voice was talking to her. G.H. testified that the physical and emotional pain she felt was "the worst feeling [she] had ever had." She stated that after spending the night in the hospital and receiving treatment, she spoke with two police officers, one of whom was Detective Chris Brown. G.H. testified that, after she described her attackers and the events surrounding her assault and rape, she was discharged from the hospital, and she left with Detective Brown. G.H. explained that Detective Brown, following the description she had given to him, drove her to the location of her rape. She said that, at the scene, she pointed out her shirt, which Detective Brown retrieved. Next, G.H. testified, Detective Brown drove her to a parking lot where her car had been discovered. She said that the back window of the car had been broken out, and there were several items inside that did not belong

to her. She explained that the Detective bagged these items, specifically sunglasses, a knife, and a lighter. G.H. stated that she found her keys in the car and decided to drive herself home. She explained that she was unable to wear her seatbelt because she had bite marks on her breasts that made it too painful.

After returning home and taking a bath, G.H. testified, she and Hamm went to the Tobacco Discount Outlet to purchase cigarettes. She explained that, when they were turning into the parking lot, Hamm pointed out a man who appeared to fit G.H.'s description of one of the men who assaulted her. G.H. stated that she recognized the Defendant and that he was wearing the same clothes as he had worn the night before, when he raped her. G.H. said that she parked the car and got out. According to G.H,. the man "turned around and gave [her] a look, a shocked look ... and took off quickly ... down the street." She explained that she called 911 and told them to send the police because she had spotted one of the men who raped her. G.H. said that she and Hamm followed the man to the location of a house that he entered. She then borrowed a friend's telephone and called 911 again. Shortly thereafter, G.H. explained, she saw the police leading the Defendant out of that house. G.H. testified that she heard the Defendant say he did not know her, and then she heard him tell the police officers that they needed to talk to his friend "Lenny."

G.H. identified the shorts, t-shirt, and shirt that she was wearing on the day of her rape, and she noted that stains and debris that were on the items were not present when she left her home the day of the rape. Further, she explained that the t-shirt was the same shirt she and Detective Brown found at the scene of her rape. G.H. also identified a pair of pants, black shirt, vest, and headband as the clothing the Defendant was wearing when he raped her and when she saw him the following day. She also identified a bracelet and ring that the Defendant was wearing on the day of the rape. She identified the lighter and sunglasses that were found in her car, and she said that the Defendant was wearing those sunglasses the day he raped her. G.H. also identified a pair of sunglasses that the second man was wearing the day of her rape, and testified that these were the sunglasses that the Defendant wore when she saw him the following day. G.H. testified that she turned over to Detective Brown two hairs that she found in her vehicle. She identified photographs of the Defendant's tattoos as being the same as those she saw on the arms of the man who raped her.

G.H. testified that her car was a 1990 Pontiac Sunbird, and she said that she purchased it about one year prior to this incident for "a little over $1,000.00."

On cross-examination, G.H. testified that she and Hamm occasionally fight when they have been drinking, and sometimes even hit one another. G.H. stated that, before picking up the Defendant and the other man, she drove past them and went to the flea market, and, upon discovering it was not open, she had turned around and was driving back the way she came when she picked up the Defendant and his friend. She stated that she did not talk to the men at all during the car ride, and that she was not in the habit of picking up strangers on the street. G.H. said that she did not flirt with or make a pass at either man, and, although her shorts were short, they were not "that short" on her. G.H. stated that she was not sure if the Defendant bought beer when he stopped at the store, because she never looked into the sack, but the Defendant took a can wrapped in a small brown bag out of the larger sack. She said that when the Defendant offered her "something to drink" she declined because she "already had a beer." She explained that, at that point, no one had made a pass at her or had threatened her. G.H. stated that the Defendant grabbed her first. She said she did not remember with which hand the other man was holding the knife, only that she felt "something sharp" held against her. G.H. stated that the man in the backseat did not hold the knife on her until she had been pulled into the passenger side seat. G.H. stated that both men pulled her clothes off of her. She repeatedly explained that she did not remember the specific number of times she was hit or beaten, because she was frightened and was only concerned with escaping.

Holly Crabtree testified that she, her two children, and her fiancé were returning from Normandy Lake when they saw a woman lying in the middle of the road. She identified this woman as the victim, G.H. Crabtree stated that there was another woman there, trying to approach G.H., but G.H. was screaming "get away from me." Crabtree said that she knew the person who lived in the trailer nearby, so she went there to call 911 while her fiancé stayed at the road to stop traffic. At this point, Crabtree explained, G.H. was wearing only a blue t-shirt. She described G.H. as "hysterical." She stated that G.H. had blood "[c]aked in her ears" and her hair, and she had blood between her thighs, on her face, and on her shirt. She explained that she tried to calm G.H. down while they waited for the police. She recalled that G.H. would not let any man approach her, not even the police or paramedics, and, in fact, a female nurse had to be called in to get G.H. into the ambulance. Crabtree testified that when

she asked G.H. what happened, G.H. exclaimed that she was raped and "they did it; they threw me out of the car."

Deputy Nikia Elliot, of the Bedford County Sheriff's Department, testified that, on the evening of August 16, 2002, he responded to a dispatch call about a woman found in the middle of Normandy road. He stated that he arrived about ten minutes later to discover a woman, whom he later learned was G.H., standing in the middle of the road with two other females. Deputy Elliot recalled that G.H. was wearing only a t-shirt and that her face was swollen and beginning to bruise. He characterized G.H. as confused. He said that G.H. would scream for men to get away from her when they tried to approach her. Elliot stated that he heard G.H. repeatedly say "they did this to me." The Deputy said that he retrieved a raincoat from his car and gave it to one of the women, who wrapped the coat around G.H. He testified that he found a pair of white denim shorts on the side of the road, approximately thirty to fifty feet from the turn-off where G.H. said she was raped. He said he placed the shorts in a bag and later turned them over to Detective Brown. Deputy Elliot explained that, while following the ambulance to the hospital that night, he called Detective Brown, and Detective Brown met him at the hospital. Elliot stated that the road where G.H. was raped runs directly behind the grocery store where G.H.'s car was found. On cross-examination, Elliot testified that he did not remember whether G.H. had blood on her legs or arms, but he did remember that her face appeared beaten and swollen.

Dr. Lynette Adams testified that she is a family practice physician. Dr. Adams explained that, on August 16, 2002, a colleague called from the emergency room and asked her to come assess G.H., because G.H. was "confused and very hostile toward any male contact." Dr. Adams said that she conducted an examination of G.H. and documented her findings, and that she prepared G.H.'s "rape kit." Dr. Adams testified that, when she arrived, G.H. was "very scared and didn't want anyone to touch her." Dr. Adams said that G.H. stated that she had been sexually assaulted, vaginally, anally, and orally.

Dr. Adams recalled that G.H. had numerous bruises and scratches, a laceration on her head, and bite marks on her breasts. She testified that, during G.H.'s pelvic examination, she found "bits of gravel and debris," both on the inside and the outside of G.H.'s body, and "a great deal of trauma to the vaginal area." Further, Dr. Adams said that she found "trauma to the external genitalia." Dr. Adams recalled that G.H.'s anal area was "reddened." Dr. Adams said that she ordered an urinalysis, which indicated the presence of

blood in G.H.'s urine. Dr. Adams testified that blood in the urine commonly occurs with physical trauma, and can be caused by, for example, a severe blow to the lower back, which would cause blood to enter the kidneys. Dr. Adams identified numerous photographs that she took of G.H. at the hospital, and she noted the various injuries to G.H.'s face, head, back, arms, and legs. Dr. Adams pointed out the many lacerations and abrasions, swelling and bruising, and bite marks depicted in those photographs. She explained that G.H. was treated for pregnancy and sexually transmitted diseases as a precaution, given medication for her pain, and that her cuts were sutured. Dr. Adams stated that she did not find the presence of semen on the external areas of G.H.'s body.

On cross-examination, Dr. Adams testified that excessive alcohol use can cause blood in urine, but she believed the most likely cause in G.H.'s case was trauma. She said, however, that G.H. did smell like alcohol, and her urine did indicate she had been drinking. Further, Dr. Adams stated that she did not remember blood on G.H.'s arms, legs, or hands, but that the blood was "caked" on her face, and in her hair. Dr. Adams said that cuts like those on G.H.'s face would bleed quite freely.

Michael Tuberville, a DNA analyst in the Tennessee Bureau of Investigation's ("TBI") serology crime lab, and an expert in the area of serology and DNA testing, testified that he tested the evidence received by the TBI in this case, including the rape-kit swabs from G.H.'s vaginal, oral, and anal areas. Agent Tuberville explained that, while he found some male DNA in the victim's swab kit, he did not find enough to compile a DNA profile. On cross-examination, the agent testified that he did not find the presence of any semen on the swab from the anal area. Agent Tuberville stated that he conducted tests of the other evidence submitted to the crime lab, and found no blood on any of the Defendant's clothing or jewelry FN5 and no semen on G.H.'s clothes.FN6 On re-direct the agent stated that this did not mean that blood and semen were not ever on these items, and on re-cross, he stated that this did not mean that blood and semen were ever on these items either.

Heather Erec, a forensic DNA analyst at Orchid Cellmark, testified that several hairs found in this case were submitted to Orchid Cellmark for DNA profiling. Erek testified that the hairs submitted all contained a root or partial root, but she was unable to extract DNA from these hair roots. Erek said that she also conducted a test on the vaginal swab from G.H.'s rape kit but was unable to identify a male profile.

Steve Jackson testified that he was the co-manager of the grocery store where the victim's car was found. He said that, at about nine or ten on the night of August 16, 2002, he noticed a "reddish color" car sitting in the parking lot. He explained that, when he arrived at work the next day, the car was still in the lot, so he contacted the Police Department. Jackson recalled that, when the police arrived, he approached the car and noticed that it had out of state tags and broken windows. Further, Jackson said that he noticed some articles of clothing and tennis shoes in the car.

Cynthia Hamm testified that she was living with G.H. in August of 2002. Hamm said that, on August 16, 2002, she and G.H. had a verbal argument, and G.H. left and drove away. Hamm stated that she did not see or hear from G.H. until the police arrived and notified her that G.H. was in the hospital in Shelbyville. She said that she took a cab to the hospital and stayed there until G.H. was released on August 17, 2002. She explained that, after G.H. was discharged, she and G.H. left the hospital with Detective Brown. Hamm stated that she rode with G.H. and Detective Brown to the scene of G.H.'s rape and to the grocery store to retrieve G.H.'s car. After the women returned home, Hamm stated, they left to go purchase cigarettes and to visit a friend. Hamm recalled that she noticed a man walking down the street who appeared to fit G.H.'s description of her rapist. Hamm identified this man as the Defendant. Hamm testified that she asked G.H. if that was the man and G.H. said "yes." Hamm said that G.H. then pulled the car "right up on him. He was right in front of the car." Hamm said that the Defendant turned and faced the car and had a "surprised look on his face." Hamm said that the Defendant then "took off down the street ... running." Hamm explained that she followed the Defendant and "scream[ed] profanity" at him. Hamm said that the Defendant cut through some grass and went into a house. Hamm explained that, although she did not actually see the Defendant enter the house, she "kind of suspected" he had gone into the house, and a "little boy told [her], yeah, he did go in there." Hamm said she remained outside the house and G.H. drove up. Hamm said that she went to a nearby friend's house to retrieve a phone, and G.H. used this phone to contact 911 again. Hamm testified that the Defendant tried to sneak out of the side-window of the house. Hamm stated that she yelled to him, and he then came out the front door. Hamm said that he began talking to G.H. She recalled that, "[a]t first he acted like he didn't know her, and then he said that it was his buddy, Lenny, that she wanted ... that she had him confused with somebody else ... that he had never been in her car ... then he admitted to being in the car, but she had dropped him off." Hamm said that

the police arrived and arrested the Defendant. Hamm testified that, prior to that day, she had never before seen the Defendant.

On cross-examination, Hamm testified that she and G.H. drank about six beers each, between approximately 11:00 a.m. and 5:00 p.m. on August 16, 2002, but she said she could not be sure about the amount because she was not keeping track. Hamm said G.H. left after they began to argue. Hamm stated that she and G.H. drank "a couple of days a week" at that time. Hamm admitted that, in the past, their arguments had become physically violent, but she denied that there was any physical contact on the day in question. Hamm testified that G.H. was full of "rage" after the rape, and could not stand to be in the city where her rape occurred, "always looking over her shoulder." Hamm said that, when the police arrived at her house the night G.H. was raped, she was across the street at a neighbor's house. She estimated that it might have been between 8:00 p.m. and 10:00 p.m. Hamm said she remembered it was "pretty late" because she had a difficult time getting a ride to the hospital. She testified that, on August 17, the police were present when the Defendant came out of the house that he entered after she chased him and he was yelling that he did not know G.H.

Detective Chris Brown testified that he is a detective with the Bedford County Sheriff's Department. He said that, on August 16, 2002, he was called to the Bedford County Medical Hospital by Deputy Elliot. He explained that he met the deputy at the hospital, and the deputy gave him a pair of white shorts that the detective placed into an evidence bag and put in his car. Detective Brown said that when he first saw G.H. at the hospital she was on a stretcher in an exam room, and she appeared "severely assaulted." He explained that G.H. did not want any males near her, and, when she heard his voice through a curtain, she became very upset, so he left the room. Detective Brown testified that, at his request, Dr. Adams performed a rape-kit on G.H. and took pictures of G.H. He said that Dr. Adams collected and gave him G.H.'s t-shirt and the hospital sheets from under G.H..

Detective Brown testified that he called in a "be on the lookout for" on G.H.'s car. According to Detective Brown, on August 17, he went to the hospital and picked up G.H. and Hamm. Detective Brown said that G.H. described where she was raped, and he drove to the sign that she remembered. Detective Brown said that G.H. was able to identify the sign and the turn-off, as well as the area where she stopped and asked the men to exit her car. He said that, as he continued driving, G.H. pointed out the trailer that she

remembered and the turn-off to the road where she was raped. He stated that they drove under the train trestle at this turn-off, and G.H. identified that spot as the location of her rape. He explained that he got out of the car to look around and noted that the area was not visible from the main road. Detective Brown said that he found an inside-out t-shirt at the scene.

Detective Brown said that, as they were leaving the scene, he received a call that the police may have found G.H.'s car. He said that he and the two women drove down the road and turned directly into the grocery parking lot. Detective Brown said that, when they arrived, there was an officer at G.H.'s car, which was parked on the right side of the lot. He said that the back windshield and the interior dome light of the car were broken. He stated that he checked the interior before G.H. approached the car, and that he found "a pair of sunglasses, a cigarette lighter, and a lock-blade style knife that has a clip on it," all of which were items that G.H. said did not belong to her. Detective Brown said that G.H. later gave to him two hairs that she found in her car.

Detective Brown stated that, later that day, he received a call about G.H.'s 911 call. He told the police to "pick up the subject" and meet him so that he could take custody of the Defendant. Detective Brown said that another officer in his department went to pick up the Defendant, and Detective Brown met them at the Bedford County Sheriff's Office. The detective identified the man at the Sheriff's office as the Defendant. Detective Brown testified that he read the Defendant his rights and explained these rights to him, and the Defendant waived his rights. Detective Brown said that, during his interview with the Defendant, the Defendant denied fleeing from G.H. and Hamm that day. He said that the Defendant admitted that he accepted a ride from G.H. on August 16, but claimed that, after stopping for beer, he did not return to the car. The Detective stated that the Defendant said that G.H. and his friend "Lenny" left the store together. The Detective said that the Defendant stated that he purchased beer at the FM Market, but that G.H. said the stop was at an Exxon.

Detective Brown testified that the Defendant said he was wearing the same vest, t-shirt and jeans that he had worn on August 16. Detective Brown said that he took these clothes as well as a bandana, a silver ring, a pair of sunglasses, and a leather bracelet. Detective Brown stated that the Defendant claimed he had gone to a night club on the evening of August 16 at around 9:00 p.m. He said that, during the interview, he had the opportunity to examine

the Defendant's person, and that the Defendant had scratch marks across his chest, which the Defendant said he had made with his own nails. The detective said that he supervised the photographing of the Defendant's tattooed arms, and identified these photographs as the photographs entered into evidence. Detective Brown testified that, after the interview with the Defendant, he obtained the surveillance video from the FM Market for August 16, and the Defendant did not appear in the video. He said that he obtained an arrest warrant for Lenny Stewart, the man that the Defendant claimed to be the culpable party, and he checked Stewart's last known address, but he no longer lived there. Detective Brown said that he entered Stewart into the National Crime Information Center, but, as far as the detective knew, this man had not yet been located.

On cross-examination, Detective Brown stated that he did not find a bra or panties at the scene of G.H.'s rape or in her car. He said that, when he interviewed the Defendant, the Defendant gave him a signed written statement. Detective Brown read the Defendant's statement:

> I and Lenny walked to Shamrocks bar on Friday afternoon, played a couple of games of pool and had a beer. We were walking back to Tullahoma when a girl pulled off by the academy and Clayton Homes and asked if we needed a ride. She offered us a beer and drove us around for a few minutes and dropped me off at the FM Market. From there, I went home, got ready to go to the club, spent the rest of the night at the club. Lenny left with her after I got out at the FM Market. It was early evening.

On re-direct examination, Detective Brown said that the Defendant generated his statement at the end of their long interview.

*Id.*, 2005 WL 49647 at **1-10 (footnotes omitted).

Grunder then filed a petition for post-conviction relief, in which he alleged he was denied the effective assistance of counsel at trial. The petition was denied after an evidentiary hearing and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Grunder v. State*, No. M2006-01503-CCA-R3-PC, 2007 WL 2011162

(Tenn. Crim. App. July 11, 2007), *perm. app. denied, id.* (Tenn. March 24, 2008) [Addendum 18].

In support of his petition for the writ of habeas corpus, Grunder raises the following grounds for relief:

1. The evidence set forth by the state in the petitioner's case was not sufficient to uphold the findings of the jury. The petitioner was denied his constitutional amendment right to due process under the Fifth and Fourteenth Amendments (U.S.C.A. 5, 14).

2. Trial counsel was ineffective by failing to adequately cross-examine the victim during trial, a violation of the petitioner's Sixth Amendment constitutional right to effective assistance of counsel and a violation of petitioner's Fifth and Fourteenth constitutional amendment right to due process of law (U.S.C.A. 5, 6, 14).

3. Trial counsel was ineffective by failing to properly investigate the petitioner's case, a violation of the petitioner's Sixth Amendment constitutional right to effective assistance of counsel, and a violation of petitioner's Fifth and Fourteenth Amendment rights to due process of law (U.S.C.A. 5, 6 14).

4. The appellate court erred when it erroneously upheld the trial court's resentencing after direct appeal. The petitioner is entitled to the full panoply of *Blakely v. Washington*, 542 U.S. 296 (2004).

5. Apply *Oregon v. Ice*, 2007 WL 2949148 (Or.) on review to the Unites States Supreme Court, 2008 WL 112170 (U.S. Or.) to the petitioner's consecutive sentences if *Ice* prevails in the United States Supreme Court.

The respondent contends he is entitled to judgment as a matter of law as to each claim based upon the findings of the Tennessee state courts.

III.    State Court Findings

Pursuant to 28 U.S.C. § 2254(d), Grunder may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and Grunder must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

IV.   <u>Discussion</u>

*A. Sufficiency of the Evidence*

Grunder alleges the evidence was insufficient as a matter of law to support his convictions.  Grunder specifically claims that the testimony was full of contradictions between pre-trial statement, testimony at trial, and the actual whereabouts of petitioner at the time of the crimes.  Petitioner insists he had an alibi, to-wit, that he was at the convenience store where the victim and co-defendant left him.  Petitioner contends that no positive hard evidence linked him to the crimes against the victim and that the only evidence against him was the eyewitness testimony of the intoxicated victim, which he submits was unreliable.

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979).  However, Grunder is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v.*

16

*Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

The Tennessee Court of Criminal Appeals on direct appeal considered Grunder's claim of insufficient evidence. The appellate court first articulated the standard under *Jackson* for challenging the sufficiency of the evidence to support a conviction:

> When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

*State v. Grunder*, 2005 WL 49647 at *13 (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)) (other internal citations omitted). The court also observed the following:

> In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by

the trier of fact. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.

*Id*. at *14 (internal citations omitted).

The appellate court then considered each of Grunder's convictions in turn. With respect to his conviction for especially aggravated kidnapping, the court first noted that the the definition of that crime, under Tennessee law, is "'knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty ... where the victim suffers serious bodily injury.'" *Id*. at *14 (quoting Tenn. Code. Ann. §§ 39-13-302, -305 (2003)). The court then concluded that the evidence was sufficient to support the conviction.

The evidence showed that G.H. requested that the Defendant and the other man, Stewart, get out of her car. After G.H. made this request, the Defendant and Stewart forcibly confined G.H., transported her to a secluded area, and she suffered serious bodily injury as a result. The Defendant admitted to the police that he accepted a ride from G.H., but said that she and Stewart left him at a convenience store. The jury accredited G.H.'s testimony that the Defendant was present, and we will not second-guess the jury on credibility issues. Therefore, we conclude there is sufficient evidence to sustain the Defendant's conviction for especially aggravated kidnapping.

*Id*.

As to the conviction for aggravated rape, the appellant court noted that aggravated rape is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim ... [and] the defendant is aided or abetted by one or more persons; and

18

force or coercion is used to accomplish the act." *Id*. (quoting Tenn. Code Ann. § 39-13-502 (2003)). The court concluded the evidence was sufficient to support the conviction. "The evidence at trial showed that the Defendant penetrated G.H. both vaginally and anally. G.H. said that this was done forcibly and against her will. The Defendant was aided in this crime by another man, Stewart. We conclude this evidence is sufficient sustain the Defendant's conviction for aggravated rape." *Id*.

With respect to Grunder's conviction for aggravated assault, the Tennessee Court of Criminal Appeals first noted as follows:

> Aggravated assault is 'intentionally ... knowingly ... or recklessly commit[ting] an assault' and either 'caus[ing] serious bodily injury' or 'us[ing] a deadly weapon.' Assault is defined as occurring when a person:
>
>> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>>
>> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>>
>> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

*Id*. at *15 (quoting Tenn. Code Ann. §§ 39-13-101, -102 (2003)).

The court then concluded that the evidence was sufficient to support the conviction.

> The evidence at trial showed that the Defendant brutally beat G.H., causing G.H. to lose consciousness repeatedly. As a result of the Defendant's beatings, G.H. suffered multiple bruises and abrasions. G.H.'s face was cut in two places, and both cuts required stitches. The Defendant bit G.H.'s breast, leaving behind swollen painful bite marks. The Defendant denies that he was present when these events took place. The jury obviously credited the victim's

testimony, and, therefore, the Defendant was found guilty of aggravated assault. Therefore, we conclude this evidence is sufficient to sustain the Defendant's conviction for aggravated assault.

*Id*.

Finally, as to Grunder's conviction for theft of property over $500.00, the appellate court noted that, under Tennessee law, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. (quoting Tenn. Code Ann. § 39-14-103 (2003)). The court concluded that the evidence was sufficient to support the conviction.

> The evidence at trial showed that the Defendant beat and raped G.H until she lost consciousness. When G.H. awoke, the Defendant, Stewart, and G.H.'s car were gone. The police located G.H.'s car in a grocery store parking lot, directly off the road where G.H. was raped. Inside G.H.'s car, the police discovered the Defendant's sunglasses and the knife used during the kidnapping and rape of G.H. G.H. testified that she purchased the car, a 1990 Pontiac Sunbird, about one year prior to its theft, for "a little over $1000.00." We conclude that this evidence is sufficient to sustain the Defendant's conviction for theft of property over $500.00.

*Id*.

This court has reviewed the transcript of Grunder's trial [Addendum 2-4, vol. I-III, Transcript of Case in Chief at Trial, pp. 1-348] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record. The proof that the victim was brutally assaulted, both physically and sexually, was uncontradicted. Grunder, who was arrested the next day, met the description of the victim's attacker as given by her to the police and was wearing the clothing and other articles described by the victim. Grunder admitted being in

the victim's car but denied assaulting her; Grunder admitted that he was wearing the same clothing on the day of the arrest as he was wearing the previous day. The victim testified as to all elements of the offenses against Grunder and she identified Grunder in open court as one of the men who attacked her. Grunder contends that the victim was not a reliable witness, but her credibility and reliability were issues for the jury to determine.

The decision of the Tennessee Court of Appeals that the evidence was sufficient to support Grunder's convictions was neither contrary to, nor did it involve an unreasonable application of, federal law as established in *Jackson v. Virginia*. Grunder is not entitled to habeas relief on this claim.


## B. Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970),

Grunder must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id*. at 691-92.

Grunder alleges two instances of ineffective assistance of counsel. He first alleges that counsel failed to adequately cross-examine the victim during trial as to inconsistencies between her trial testimony and out-of-court statements. He next alleges that counsel failed to properly investigate the case, by failing to meet with Grunder early in the case to develop defense strategies and to talk to potential witnesses.

These were among the same claims of ineffective assistance of counsel considered and rejected by the Tennessee Court of Criminal Appeals in post-conviction proceedings:

> On appeal, the Petitioner claims that the trial court erred in denying the petition for post-conviction relief. He asserts a number of bases for his claim of ineffective assistance of counsel. First, Counsel was ineffective in not cross-examining the victim about what time she left her house, who held the knife, whether she saw the Petitioner in a crowd or walking by her car, whether or not the Petitioner tried to jump out of a window, what her blood

alcohol level was, her mental history, and whether she stated one of the assailants looked like a relative of hers. Second, Counsel did not properly investigate the case in that he failed to interview key witnesses while their memories were fresh enough to remember the Petitioner's whereabouts on the night in question.

*Grunder v. State*, 2007 WL 2011162 at \*5.

The appellate court first summarized the evidence at the post-conviction hearing, as well as the trial court's findings in denying post-conviction relief:

At the hearing on the post-conviction petition, the Petitioner testified that his counsel at his preliminary hearing was Michael Collins of the Public Defender's Office. After the preliminary hearing, Jack Dearing, also of the Public Defender's Office, took over his case. The date of the offense was August 16, 2002, and he was arrested the next day. At the preliminary hearing in November 2002, the victim testified, and, although there is no tape or transcript of the preliminary hearing, the Petitioner took notes. The Petitioner stated that he observed a number of discrepancies between the victim's testimony at the preliminary hearing and at trial.

First, at the preliminary hearing, the Petitioner claimed the victim testified she left her house at 7:00 p.m., while, at trial, she testified it was at 5:00 p.m. Second, at the preliminary hearing, the Petitioner claimed that the victim testified the Defendant held a knife to her, while, at trial, she said he did not have a knife. Third, at the preliminary hearing, he alleged the victim testified that she picked the Petitioner out of a crowd at the Tobacco Outlet, while, at trial, she stated he was walking across a parking lot in front of her car. Fourth, at the preliminary hearing, the victim did not testify about the Petitioner jumping out of a window, while, at trial, she did. Fifth, at the preliminary hearing, the court asked the victim if her friend was present as a witness, and the victim responded she was just there as a friend. This person testified at trial. Sixth, at the preliminary hearing, the victim did not mention that one of the assailants looked like a relative of hers, while, at trial, she did.

After the preliminary hearing, the Petitioner stayed in jail, and Jack Dearing ("Counsel"), became his attorney. The Petitioner stated that Counsel came to see the Petitioner about six times, most of the time not bringing his file. The Petitioner had questions and requests, to which he claimed counsel

never responded. The Petitioner asked Counsel to obtain a transcript of the preliminary hearing because he knew the victim was lying, and the Petitioner asked Counsel to visit potential witnesses. The Petitioner stated none of his requests were completed, and it was six to eight months before the witnesses were interviewed. The Petitioner claimed these witnesses would provide an alibi in that they could testify he was at a bar at 5:00 p.m.

The Petitioner further testified he was able to look at the victim's medical records, and he noticed further discrepancies between statements she gave to doctors and her testimony at trial. In the medical report, the victim stated she bit the Petitioner on the penis while he was attempting to have oral sex with her, but she never testified to that at trial. Further, the medical report indicated that the victim's blood alcohol level was a .23, but Counsel did not question the victim on the issue. There was also evidence in the medical report that the victim was depressive and suicidal, but Counsel never questioned the victim on that issue either.

The Petitioner also testified that the victim changed the time of the attack from 7:00 p.m. to 5:00 p.m., and this was important because the Petitioner claimed he was at "BJ and Pauline's" at 7:00 p.m. He stated that he asked Counsel to find BJ and Pauline, but this was not done. Additionally, the Petitioner testified that he asked Counsel to locate Terry Luther and Robert Luther, because the Petitioner claimed the Luthers would be able to testify that the Petitioner was not trying to escape out of the window of their house the day he was arrested. The Petitioner admitted that, although Counsel apparently found the Luthers, they were unable to offer anything helpful.

The Petitioner also claimed that there were no fingerprints or DNA evidence linking him to the crime, and he believed Counsel should have asked more questions about those issues. Also, the Petitioner believed that Counsel did not keep him adequately informed of the progress of his case. The Petitioner testified that, for example, during the breaks at trial, he never spoke with Counsel. The Petitioner also complained that Counsel failed to raise issue with inconsistencies in DNA testing, and that although there were alleged scratch marks on the Petitioner, no pictures were ever taken of the scratch marks or lack thereof. Further, the Petitioner complained that Counsel should have been present when pictures were taken of his tattoos. The Petitioner also claimed Counsel should have gone to Favorite Market to look at videotape, which would have supported his claim that he got out of the victim's car and walked home at around 5:00 p.m. The Petitioner also stated neither he nor the

Public Defender's Office ever received one of the two statements made by the victim.

On cross-examination, the Petitioner admitted that Counsel brought some things to him in jail, and he and Counsel discussed the facts of the case. The Petitioner testified that Counsel stated he would attempt to obtain the tape of the preliminary hearing, but, to his knowledge, it was never accomplished. The Petitioner acknowledged that the Public Defender's Office did go to Tullahoma and talked to Terry Luther. The Petitioner admitted his mistake as to the name, and he stated that Counsel did speak with Luther, but Luther's version of the events did not help the Petitioner. The Petitioner stated he was not aware that Luther's recollection coincided with that of the victim. However, the Petitioner stated that Counsel never explained the efforts made to find BJ and Pauline.

The Petitioner acknowledged that Counsel met with two other potential alibi witnesses, both of whom provided no help, and that Counsel questioned witnesses about DNA evidence. The Petitioner admitted he was told that Counsel went to Favorite Market to ask for the tapes, but he was not aware of this until the sentencing hearing. The Petitioner also could not explain what he believed would have been different had Counsel been present when pictures of his tattoos were taken by the police.

Counsel testified that he worked on the Defendant's case with two investigators. Counsel directed these two investigators on January 21, 2003, to visit the Petitioner, get the names of any witnesses from him, and obtain the preliminary hearing tape. Counsel stated that there were no documents in his file showing any investigation was done prior to January 21; however, he and Collins, the Petitioner's original attorney, talked with the Petitioner prior to that date. Counsel requested discovery on November 19, 2002, and the State responded on January 10, 2003. Counsel admitted that, generally speaking, witnesses' memories are better the sooner they are interviewed. Counsel stated that both of the relevant bartenders were interviewed, and one of the bartenders stated that he had no recollection of the date in question. However, Counsel stated that the Petitioner told him that he did not go to the bar until 9:00 p.m ., so any witnesses would have been after-the-fact witnesses. Counsel did admit that this person could be relevant as an after-the-fact witness to describe the Petitioner's appearance and lack of blood.

Counsel further testified that any discussion in the victim's medical file about who attacked her was not inconsistent with what she testified to at trial. Thus, it was a tactical choice not to bring that issue up on cross-examination. In addressing the lack of a photograph of the Petitioner's penis, Counsel stated that there was no allegation of a bite mark, only a bite. So, there was no reason to photograph the penis. Counsel stated he did not intensively cross-examine the victim as to her blood alcohol level because the State had already brought out that evidence. Counsel also testified that evidence regarding the victim's mental health was from several years before trial, and he therefore felt there was no need to address it.

Counsel stated that the main thing he remembered about the victim's testimony at the preliminary hearing was that she said the Petitioner had the knife. At trial, the victim testified that the other man, not the Petitioner, held the knife. Counsel made a tactical decision not to further question the victim on this issue because he did not want to "put the knife in [the Petitioner's] hands...." Counsel and his investigators searched for, but never found, the preliminary hearing tape.

On cross-examination, Counsel testified that he has been an attorney for eight years, and his investigators have up to twenty years experience. Once the Petitioner was indicted, Counsel met with him, and his notes were reduced to a memo in which he requested his investigators interview the Petitioner and possible witnesses. After all the interviews, Counsel determined these potential witnesses had no helpful information. The Petitioner asked Counsel to locate Pauline and BJ close to, or after, trial. Those two individuals were never found. Counsel was never given their last names or addresses. The investigators did locate Terry Luther, but his recollection coincided with that of the victim. The investigators also attempted to obtain the videotapes from the Favorite Market, but those tapes are re-used on a thirty-day cycle. Additionally, there was no camera that focused on the exterior of the store. Counsel stated that the person that the victim initially thought she recognized as her cousin or someone she attended school with was the other assailant. Additionally, Counsel testified that there was no indication that any bite mark to the Petitioner's penis broke the skin, but, even if it had, it would have long since healed by the time Counsel was appointed to represent the Petitioner.

Counsel further testified that he cross-examined the DNA experts concerning the lack of evidence linking the Petitioner to the victim. He also vigorously opposed the photographing of the Petitioner's tattoos. However, the

trial court allowed the pictures to be taken. In addressing the venue issue, Counsel stated that all normal procedures were followed during voir dire, and he recalled that three jurors were excused by him for cause. Additionally, any jurors who were exposed to pretrial publicity would have been excused by the trial court. Counsel testified that he met with the Defendant at least ten times, they discussed the facts and developments, he apprised the Petitioner of any developments in discovery, and they also discussed potential defenses and strategies. On re-direct examination, Counsel admitted that, as soon as Collins was appointed, he could have gone to talk to the Defendant about interviewing witnesses.

The trial court determined that the Petitioner had not met his burden of proving ineffective assistance of counsel in that the evidence presented was totally devoid of anything that would have had an effect on the outcome of trial. The court found the defense's strategy was to claim the State had not met its burden of proof, and that was the best strategy in this case. The Petitioner's allegations were generalities, i.e., more could have been done. The trial court found Counsel and the Public Defender's Office did a thorough investigation into the facts and allegations.

The trial court found that the State elicited the testimony concerning the victim's drinking "to try and steal the thunder of cross examination." Even after that, Counsel questioned the victim at length. As to the knife, Counsel made an appropriate strategic decision to cross-examine the victim without affording the victim an opportunity to testify that the knife was actually in the Petitioner's hands. The victim was also questioned about the statements in the medical records, she explained them, and the jury chose to accredit her testimony. The witnesses, BJ and Pauline, were not found by Counsel, nor were they found by the Petitioner for the post-conviction hearing. It was unclear if these people even exist, and it was impossible to say they would have helped the Petitioner in any way. Terry Luther was located and his testimony was not beneficial to the Petitioner. In fact, it supported the victim's version of the events. The two individuals at the bar, whom the Petitioner claimed would provide an alibi, were not able to do so. Counsel also adequately cross examined the witnesses about the lack of the Petitioner's DNA on the victim. As such, the Petitioner's petition was denied.

*Id*. at **1-5 (footnote omitted).

In analyzing Grunder's claims of ineffective assistance of counsel, the Tennessee Court of Criminal Appeals first noted the two-part standard of review set forth in *Strickland*. *Id*. at *6 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The appellate court then rejected Grunder's arguments:

First, addressing the Petitioner's claim that Counsel did not appropriately investigate the case, the Petitioner had his preliminary hearing sometime in late August, 2002. He was indicted by the grand jury on November 18, 2002, Counsel submitted discovery requests on November 19, 2002, and the State responded on January 10, 2003. Counsel requested his two investigating officers interview the Petitioner on January 21, 2003, and the Petitioner's leads were tracked down shortly thereafter. Pauline and BJ were neither found by the investigators, nor were they produced at the post-conviction hearing. Terry Luther was found, but his information was not helpful to the Petitioner. The two individuals at the bar were found and they stated they could not remember the day in question. Although it is likely that these individuals' memories would have been clearer had they been interviewed earlier, such speculation is not sufficient evidence upon which to find Counsel was deficient.

In cross-examining the victim, Counsel made the strategic decision not to inquire about inconsistencies in her testimony about who carried the knife. Concerning the victim's drinking, Counsel questioned the victim on this issue for five pages of transcript. The victim also attempted to explain her problems in initially identifying the man whom the Petitioner was with. The jury heard the evidence on this issue, and the victim's explanation was not wholly inconsistent with her statements in the medical reports. She initially thought the man with the Petitioner was her cousin or someone with whom she attended high school. Luther's recollection of the arrest coincided with that of the victim, so there was no need to examine the victim on that issue. Additionally, whether the Petitioner was spotted in a crowd, or walking by the car are not necessarily inconsistent.

The Petitioner has also alleged the victim should have been questioned about her biting the Petitioner's penis. However, Counsel testified that there was no evidence of bite marks, only a bite. The Petitioner also alleges the victim should have been questioned about her past mental problems, but there

is no evidence in the record that such testimony would have been admissible. Counsel stated he believed it was years before the attack, and it was thus irrelevant. While the victim may have been unsure about the time she was attacked, she was questioned on the issue. Counsel questioned her, and she responded, "I'm not quite sure at the times because I wasn't even looking at the clock." Upon review, we conclude that the Petitioner has not proven any deficient performance on the part of Counsel.

We note that virtually all of these alleged inconsistencies relate to the preliminary hearing. The Petitioner has failed to produce any evidence, besides his personal recollection, of the actual testimony from the preliminary hearing. Even if we were to accept the Petitioner's recollection, the Petitioner has not proved that cross-examination on any issue Counsel declined to address would have effected the trial. The Petitioner has not proven Counsel was deficient in his representation or that any of Counsel's actions prejudiced the Petitioner. He is not entitled to relief on this issue.

*Id*. at **7-8.

In denying relief at the conclusion of the post-conviction hearing, the trial court specifically found that the State first elicited from the victim the fact that she had been drinking and then counsel extensively cross-examined her as to that fact, and thus the jury was well aware that the victim had been drinking quite a bit. [Addendum 13, vol. 1, Transcript of Post-Conviction Relief Hearing, p. 113]. The court also noted it was proper trial strategy to not question the victim about her prior inconsistent statement that Grunder had the knife, when she testified otherwise at trial. [*Id*.]. With respect to counsel's failure to locate witnesses whose last names were not provided, the court noted that Grunder was not able to produce them at the post-conviction hearing, and thus counsel could not be found at fault for failure to locate them. [*Id*. at 114-15].

This court has reviewed the transcript of Grunder's post-conviction hearing [*id*. at 1-97] and finds the conclusions by the trial court and by the Tennessee Court of Criminal Appeals are supported in the record. Grunder's attorney raised the issue of the victim's use of alcohol not only with the victim but with other witnesses. Counsel made clear to the jury that there was no direct physical evidence linking Grunder to the offenses, including the fact that no blood was found on Grunder's clothing despite the fact that the victim was covered with blood. Counsel was unable to locate the transcript of the preliminary hearing nor was he able to locate two of Grunder's alleged alibi witnesses, having been given only first names; counsel interviewed the other alibi witnesses, who were not beneficial to the defense.

The findings of the state courts are supported in the record and are neither contrary to, nor do they involve an unreasonable application of, federal law as established in *Strickland v. Washington*. As previously noted, this court reviewed the transcript of Grunder's trial. His attorney presented a spirited defense on behalf of Grunder. Unfortunately for Grunder, the jury chose to accredit the testimony of the victim and evidence of guilt was more than sufficient to support Grunder's convictions. Based upon the foregoing, Grunder has failed to demonstrate he received ineffective assistance of counsel under the *Strickland* standard. He is not entitled to relief on this claim.

*C. Sentencing Issues*

Grunder was sentenced by the trial court as follows: 23 years on both the especially aggravated kidnapping and aggravated rape convictions, both of which are Class A felonies, to be served concurrently; six years on the aggravated assault conviction, a Class C felony, to be served consecutively; and two years on the conviction for theft of property over $500.00, a class E felony, to be served consecutively; for a total effective sentence of 31 years. *State v. Grunder*, 2005 WL 49747 at *19.

In considering Grunder's challenge to his sentence, the Tennessee Court of Criminal Appeals first summarized on direct appeal the sentencing options and procedures available under state law as to the sentencing of Grunder, a Range 1 offender:

> The sentence range for Class A felony, Range I offenders is fifteen to twenty-five years. In calculating the sentence for a Class A felony, the presumptive sentence is the midpoint of the range, in the absence of enhancement and mitigating factors. If there are enhancement factors but no mitigating factors, the sentence must be set at or above the midpoint of the range. If there are mitigating factors but no enhancement factors, the trial court must set a sentence at or below the midpoint of the range. If there are both mitigating and enhancement factors, the trial court must adjust the sentence based on the weight it assigns to each factor.

> In calculating the sentence for a Class C or E felony conviction, the presumptive sentence is the statutory minimum for a Range I offender if there are no enhancement or mitigating factors. If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. The sentence range for a Range I offender for a class C felony is not less than three

years or more than six years, and for a class E felony is not less than one year or more than two years.

*Id.* (citations omitted).

At sentencing, the trial court applied five enhancement factors in accordance with state law: (1) Grunder had a previous history of criminal convictions; (2) Grunder was a leader in the offense; (3) Grunder treated or allowed the victim to be treated with exceptional cruelty; (4) Grunder had a previous history of unwillingness to comply with conditions of release; and (5) Grunder possessed or employed a deadly weapon during the commission of the offense. *Id.*

On direct review, the Tennessee Court of Criminal Appeals found that Grunder was entitled to relief under *Blakely v. Washington*, 542 U.S. 296 (2004), which precludes a sentencing court from enhancing a sentence above the "statutory maximum," which is defined as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at 303 (citations omitted). The appellate court determined that Grunder's prior criminal record was a proper enhancement factor under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *State v. Grunder*, 2005 WL 49747 at *20. The court also found that the use of Grunder's prior unwillingness to comply with the conditions of release was harmless error under *Blakely*, because Grunder admitted to the same. *Id.* The court further found, however, that the use of the remaining enhancement factors was improper and did not constitute harmless error. *Id.*

Based upon the foregoing, the appellate court modified Grunder's sentences on the especially aggravated kidnapping and aggravated rape conviction from 23 years to 22 years; the court modified the sentence on the aggravated assault conviction from six years to five years; the sentence for the theft conviction was not modified. *Id*. at *21. The concurrent and consecutive nature of the sentences were not changed and Grunder thus received an effective sentence of 29 years. *Id*.

In his habeas petition, Grunder argues that the sentence modification did not cure the *Blakely* error because the trial judge applied the enhancement factors instead of the jury. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court considered an enhanced punishment for a firearm conviction under New Jersey's hate crime statute, and held: "*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." *Id*. at 490 (emphasis added). The Court clearly made an exception for prior convictions and that exception has not changed in the intervening years. *See United States v. Bradley*, 400 F.3d 459, 462 (6th Cir. 2005) ("From *Apprendi* to *Blakely* to *Booker*, the Court has continued to except such factfinding [of prior convictions] from the requirement of the Sixth Amendment."). Accordingly, Grunder's prior criminal record was an enhancement factor properly considered by the state courts.

With respect to the enhancement factor based upon his unwillingness to comply with conditions of release, Grunder admitted at sentencing that his probation had been revoked

33

on two occasions.  [Addendum 5, Transcript of Sentencing Hearing, pp. 39-42].  Under those circumstances, the application of the enhancement factor was proper under *Blakely*.

The decision of the Tennessee Court of Appeals as to Grunder's sentence was neither contrary to, nor did it involve an unreasonable application of, federal law as established in *Apprendi v. New Jersey* and *Blakely v. Washington*.  Grunder is not entitled to habeas relief on this claim.

Grunder also raises a claim with respect to consecutive sentencing pursuant to *State v. Ice*, 170 P.3d 1049 ( Or. 2007), *rev'd*, 129 S. Ct. 711(2009).  In *Ice*, the Oregon Supreme Court held that, pursuant to *Apprendi* and *Blakely*, the Sixth Amendment requires that facts other than prior convictions which are used to impose consecutive sentences must be found by the jury or admitted by the defendant.  The Supreme Court reversed, holding that the Sixth Amendment does not prohibit States from assigning to judges, rather than to juries, the task of finding the facts necessary for imposition of consecutive sentence.  129 S. Ct. at 714-15.

At the time Grunder filed the pending habeas petition, the Supreme Court had granted *certiorari* to consider the issue, but had not yet issued its opinion.  The Court having reversed the Oregon Supreme Court, Grunder is not entitled to relief on this issue.

V.    Conclusion

The respondent's motion to dismiss will be **GRANTED**, the petition for habeas corpus relief will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.  Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts.  Grunder having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure.  The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous.  *See* Rule 24 of the Federal Rules of Appellate Procedure.  The court will further **DENY** Grunder leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**

                              */s/Harry S. Mattice, Jr.*
                              HARRY S. MATTICE, JR.
                              UNITED STATES DISTRICT JUDGE